IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 14, 2021

FILED

03/17/2022

Clerk of the
Appellate Courts

**STATE OF TENNESSEE v. JOSHUA V. LOWE**

**Appeal from the Circuit Court for Maury County**
**No. 60CC1-2019-27785     Stella L. Hargrove, Judge**

_____

**No. M2020-01480-CCA-R3-CD**
_____

The Appellant, Joshua V. Lowe, pled guilty in the Maury County Circuit Court to theft of property valued at $10,000 or more but less than $60,000.  Pursuant to the plea agreement, the Appellant received a sentence of six years in the Tennessee Department of Correction and was placed on probation.  The trial court ordered restitution in the amount of $52,000 to be paid in monthly installments of $773.  On appeal, the Appellant contends that the trial court abused its discretion by failing to consider the Appellant's ability to pay when setting the amount of restitution.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JILL BARTEE AYERS, J., joined.

Brandon E. White (on appeal) and Colby Block (at trial), Colombia, Tennessee, for the Appellant, Joshua V. Lowe.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Brent C. Cooper, District Attorney General; and M. Caleb Bayless, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The Maury County Grand Jury returned an indictment charging the Appellant with theft of property valued at $10,000 or more but less than $60,000, a Class C felony; forgery valued at $10,000 or more but less than $60,000, a Class C felony; and identity theft, a Class D felony.

The Appellant pled guilty to theft valued at $10,000 or more but less than $60,000 in exchange for the dismissal of the remaining charges. At the Appellant's August 3, 2020 guilty plea hearing, he agreed that he was accepting a sentence of six years and that he would be placed on probation. Pursuant to the plea agreement, the amount of restitution was to be determined by the trial court at a restitution hearing. The Appellant agreed that he could "pay at least $100 a month toward court costs and any restitution" beginning in September. The trial court cautioned the Appellant that his probation could be revoked if he could not pay his court costs and restitution. The Appellant said that he was thirty years old and that he had taken some college courses to be a welding engineer. The Appellant explained that he was unemployed but that he had a job interview the following day.

The State recited the following factual basis for the guilty plea:

> [I]n case 27783, count one, if the State were to proceed to trial on this case, the State would put on proof that on or about the 6th day, 2019, in August, before the finding of this indictment, this [Appellant] did knowingly obtain property, to wit: A 2016 Dodge Hellcat Challenger, from the Dodge dealership here in Maury County, Tennessee that had the value of between $10- and $60,000, Your Honor, without their effective consent to take it. He used a separate name to acquire that Dodge Challenger. And that's the purpose behind this theft.

At the restitution hearing, the State said:

> Ultimately what [the Appellant] did in this was have information in regards to another individual that he appeared before the Dodge dealership here in Columbia, Tennessee, presented that information, and purchased a vehicle.
>
> And ultimately that vehicle was taken to Tuscaloosa, Alabama.
>
> The police there got involved, went and confiscated that particular vehicle. It was placed in the Tuscaloosa Police Department impound lot.
>
> And ultimately on the same night it was recovered, it was stolen from the Tuscaloosa Police Department impound lot.

To my surprise, and probably many people's surprise, the Tuscaloosa Police Department impound lot did not have video cameras and did not have very good security in that regard and so I believe that [defense counsel] is wanting to stipulate that the vehicle was recovered and ultimately stolen again from a police department.

And so what we are here about is the restitution issue in which [the Appellant] would owe to our local dealership in regards to the forged purchase of the car.

Defense counsel stated the Appellant admitted at the guilty plea hearing "that he was involved with stealing the vehicle by obtaining that other individual's identity and purchasing that vehicle through that identity and their credit." Defense counsel asserted, however, that no evidence existed suggesting the Appellant was involved "with the subsequent theft that occurred from the police department, the theft of the vehicle once it was recovered by Tuscaloosa Police and was being held before being returned to the owners." The State agreed that no proof existed establishing the Appellant's involvement in the subsequent theft of the vehicle and that the Appellant had not been charged in Alabama regarding the subsequent theft of the vehicle.

Henry Loggins testified that he was the "pre-owned manager" at Columbia Chrysler and that his job involved appraising cars, getting cars reconditioned for the lot, and "[j]ust making the decisions on whether we keep the car, wholesale it, things like that." Loggins recalled that the Appellant came to the dealership in 2019 and purchased a 2016 Dodge Challenger Hellcat using the name of Chase Clary, that the Appellant said his name was Chase Clary, and that the Appellant had a driver's license bearing the Appellant's photograph but Clary's name. Loggins explained that a Dodge Challenger Hellcat had "quite a bit more horsepower than the average Challenger. It's a hotrod car. Very sought after. Very expensive." Loggins said that the car the Appellant took had 6,000 miles on it and that it had a "value of around $58,000," explaining that the value was "based upon what the banks will let you borrow against it, the loan value of it. It's based off of what other cars like it is doing in our area." Loggins said that the car could probably be purchased for $56,000 at auction, explaining that the auction price was lower than the estimated value because "[y]ou have got to be able to advance it and make a profit when you buy at the auction."

Loggins stated that the purchase price of the car was $49,556. The Appellant did not "put any money down," and the amount financed was $58,508.43, which included taxes, "PermaPlate," a warranty, and a service contract. Loggins said that the car was a trade-in from another customer and that it was "an expensive . . . very sought-after car. It's low mileage and very pristine condition. And we would have had no problem selling this

to somebody else and getting the money . . . .  [The Appellant] has [taken] the money away from us."

On cross-examination, Loggins stated that he did not recall how long the car was at the dealership, but he stated that it was "[n]ot long because none of them stay long.  They sell pretty quick."  Loggins stated that the Appellant had attempted to finance the car through the Bank of America.  Loggins acknowledged that the Appellant took physical possession of the car and that the bank had agreed to "buy the note."  However, when the bank "found out [the car] was bought under false pretenses, they didn't fund the deal so [the dealership was] out the money."  Loggins said that the dealership received no compensation from insurance for the loss of the car.

Edward Collier, Jr., testified that he was the "dealer principal" and general manager at Columbia Chrysler Dodge Jeep Ram and that his job was to "oversee everything at the store."  Collier said that the dealership had insurance but that the insurance did not cover identity theft.  As a result, the dealership received no payment from insurance, and the loss was $52,000 and "some change."

On cross-examination, Collier stated that he could not recall at what point in the transaction the dealership learned of the fraud.  The dealership filed a claim against the State of Alabama for the second theft of the vehicle but that claim was denied.

The Appellant testified that he lived in Tuscaloosa, Alabama, and that he was unemployed.  He was attending the Southern Alabama School of Cosmetology and was studying to be a nail technician.  Since July, he had been attending school for twenty-four hours each week, with classes on Tuesday, Wednesday, and Thursday.  The Appellant stated that he could not charge anyone for his work until he had a certain number of hours of experience.  After earning the requisite hours, the Appellant would be an apprentice. The Appellant explained that while he was an apprentice, he would work under a supervisor who would set the rates the clients would be charged.  The Appellant said that he was scheduled to take the "board test" in February and that if he passed, he would be licensed. He and his family had discussed the possibility of opening his own nail salon, which he estimated would cost $15,000.

The Appellant said he had been a coal miner in Brookwood, Alabama, but he lost his job when he was incarcerated.  After his arrest, he tried to get a job with four coal mining companies.  Two of the companies he contacted "didn't get back with" him.  The Appellant was supposed to start work with one of the companies; however, the company refused to hire him after the background check revealed the instant charges.  The Appellant said that, generally, a person employed in the coal mining industry was required to stay within his own state.

The Appellant said that he wanted to try to find a job so he could work at night, sleep in the morning, and attend classes later. He maintained that he had submitted over thirty job applications. He had started one job the previous month and worked one week before he was fired because the background check revealed the instant felony conviction. The Appellant said had not received any response from the places to which he submitted the other applications.

The Appellant said that he also had a background in welding but that many welding jobs had "slowed down" because of COVID. The Appellant stated that because of the felony conviction and his being on probation, his options were limited.

The Appellant said that he hoped his cosmetology business would be profitable, but he acknowledged that he had never operated a cosmetology business. The Appellant stated that he lived with his mother in Tuscaloosa and that he paid monthly rent of $500 to her. He explained that his mother had suffered a heart attack and two strokes and that he and his sister had to "take up" his mother's part. The Appellant paid $100 towards the electric bill each month, and he estimated that his monthly food bill was $300. The Appellant had two children, a son who was nine years old and a daughter who was five years old. The Appellant acknowledged that he did not pay child support but that he had his children every Friday, Saturday, and Sunday. The Appellant said that he spent approximately $200 per month for each child's care. The Appellant said that he had a vehicle but that it was registered in his girlfriend's name. Each month, he spent approximately $400 for gas, $150 for insurance, $150 for tuition, and $75 for his cellular telephone. He did not receive any unemployment benefits, and his 2015 Yukon had been repossessed. The Appellant said that he thought his future career was in cosmetology, not welding.

On cross-examination, the Appellant estimated his mother and other family members had paid approximately $4,000 to keep him out of jail pending trial, and he agreed that his family would help him "in a pinch." The Appellant said that when he worked in welding, he earned $3,500 or $4,000 every two weeks.

The Appellant said that he pled guilty in August and that the restitution hearing was in October. He had been ordered to pay $100 toward restitution, beginning in September.

The Appellant explained that when he was working in the coal mine, he was getting ready to buy a house and also had a 2015 Yukon "on my credit." The Yukon was subsequently repossessed. The Appellant had been speaking with a man[1] who "supposedly fix[ed] credit." The man told the Appellant that he could obtain credit using a "credit profile number" instead of his social security number. The Appellant "looked it up[,] YouTubed, all of that stuff," and "it was basically was saying the same thing he was

---

[1] The Appellant never identified the man by name and referred to the man only as "the dude."

- 5 -

saying." The man charged the Appellant $2,000 and told the Appellant he would "take care of everything." The man told the Appellant that the vehicle would not be in the Appellant's name. The Appellant thought the man would make up a name. The Appellant did not know the man would use someone else's identity. The Appellant explained, "It was, like, he would just make up a name. He just said John Stevenson and put credit under the name." The Appellant did not know that the man would use Clary's identity. The Appellant said, "I never gave [the dealership] an ID or anything, all of that was already at the dealership when I got there and the only thing I had to do was just sign and drive off." The Appellant stated that the man chose the dealership based on the kind of car the Appellant wanted. The man notified the Appellant that a dealership in Columbia had the car the Appellant wanted, and the Appellant went to the dealership. The Appellant asserted that he gave the Dodge to the police.

The Appellant acknowledged that he was thirty-one years old at the time of the sentencing hearing and that he realized "nothing in life comes free." The Appellant said that the man told him he would be paying approximately $500 each month for the car. The Appellant said that he thought everything with the purchase of the car "would be straight" and that the man had sent the identification to the dealership and had handled all of the business part before the Appellant arrived.

The Appellant acknowledged that after purchasing the Dodge Challenger Hellcat, he and his ex-wife, Kay Counce Jones, went to Duluth, Georgia. Jones had intended to buy a Maserati using the Clary identification, but she planned to make the payments for the car. The Appellant said that he and his ex-wife were divorcing "because she was messing with the dude that did this stuff that I got into."

The Appellant said that he did not have a high school diploma but that he had "what you call it, ability for benefit. It allows you to take courses in college once, you know, I guess you would call it trouble." The Appellant acknowledged that he told the preparer of the presentence report that he was in excellent mental and physical health and that when he was working in the coal mines, he was making $3,500 to $4,000 bi-weekly.

The Appellant said that when he was working for the coal mines, he "was head of the section where we make coal, miner operator, maintenance, whatever." The Appellant explained that he was responsible for the workers' safety and production. At the time his employment was terminated, the Appellant was earning $29.92 per hour and $1,000 per month as a "safety bonus." The Appellant said that he "was sometimes working right at a hundred hours a week . . . [i]f [he] could." The Appellant said that he would be unable to return to coal mining, noting that he would be excluded after a background check because "[y]ou have to be around explosives up underground, they use explosives, so you wouldn't get approved through, like, ATF stuff to be underground."

The Appellant agreed that he planned to return to work as soon as he could. He stated that he had the responsibility to pay the dealership and to support his children. The Appellant said that regardless of the amount the trial court imposed, "whether I find it fair or not," he had to pay that amount to stay out of jail.

On redirect examination, the Appellant acknowledged that he used to earn up to $7,000 each month but said that he would be unable to get a job in coal mining for seven years. The Appellant said that he had put in thirty applications "through my e-mails and stuff."

In determining the amount of restitution, the trial court stated:

> We have a man that is now a convicted felon upon his own admission of guilt. I am not so sure he is in a position to start over at this time. I don't know that. But if he is starting over, he is going to have two or three other jobs.
>
> The Court finds the pecuniary loss of the victim to be $52,000. The Court finds that [the Appellant] has the ability to pay that, particularly with extra jobs as welding as well as any pursuit continuing in cosmetology that he wishes to do.

The trial court further ordered that the restitution was to be paid in monthly installments of $723. The trial court arrived at the monthly payment by considering the length of the sentence and the Appellant's ability to pay that amount during the term of his probation.

On appeal, the Appellant contends that the trial court abused its discretion by finding that the Appellant had the ability to pay $52,000 in restitution during the course of his six-year probationary sentence. The Appellant asks this court to reduce the monthly amount he is required to pay during his six-year sentence or remand for a hearing to determine an amount he has the ability to pay during his six-year sentence.

## II. Analysis

Initially, we note that this court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). This court previously has noted that "[r]estitution is authorized by the statute governing alternative sentences." State v. Jennifer Murray Jewell, No. M2015-02141-CCA-R3-CD, 2017 WL 65242, at *5 (Tenn. Crim. App. at Nashville, Jan.

6, 2017) (citing Tenn. Code Ann. § 40-35-104(c)(2)). Accordingly, "[t]his court has previously determined that the abuse of discretion standard of review applies to decisions regarding restitution." Id. (citing State v. David Allan Bohanon, No. M2012-02366-CCA-R3-CD, 2013 WL 5777254, at *5 (Tenn. Crim. App. at Nashville, Oct. 25, 2013)).

Tennessee Code Annotated section 40-35-304(a) provides that "[a] sentencing court may direct a defendant to make restitution to the victim of the offense as a condition of probation." The amount must be based on the victim's pecuniary loss. See Tenn. Code Ann. § 40-35-304(b). "Pecuniary loss" consists of special damages and out-of-pocket expenses incurred by the victim relative to investigation and prosecution of the crime. Tenn. Code Ann. § 40-35-304(e). All restitution orders must be determined via the procedure in Tennessee Code Annotated section 40-35-304. See Tenn. Code Ann. § 40-35-304(g). The procedure requires, among other things, that the court "specify at the time of the sentencing hearing the amount and time of payment . . . and may permit payment or performance in installments." Tenn. Code Ann. § 40-35-304(c). The procedure also requires that the court "consider the financial resources and future ability of the defendant to pay or perform." Tenn. Code Ann. § 40-35-304(d). "[T]he trial court, in determining restitution, must also consider what the [A]ppellant can reasonably pay. An order of restitution which obviously cannot be fulfilled serves no purpose for the [A]ppellant or the victim." State v. Johnson, 968 S.W.2d 883, 886 (Tenn. Crim. App. 1997).

On appeal, the Appellant acknowledges that he pled guilty to theft and that restitution is mandatory for theft convictions. See Tenn. Code Ann. § 40-20-116(a). The Appellant further acknowledges that he "made a very good living" as a welder and as a coal miner before his felony conviction. The Appellant contends, however, that due to his felony conviction, he is unable to return to work as a welder or a coal miner. The Appellant contends, therefore, that the trial court abused its discretion in ordering him to pay the entire $52,000 in restitution during his six-year probationary sentence. The Appellant contends that he is "an unemployed convicted felon attending cosmetology school who was and continues to be indigent [and] has no ability to pay $52,000 in restitution over the course of six years."

The State responds that the trial court considered the victim's pecuniary loss, the Appellant's financial resources, the Appellant's personal and social history, and the Appellant's current and future ability to pay. The record supports this assertion. This court has previously stated that "[e]ven a high restitution payment may be upheld . . . where the trial court has considered the defendant's ability to pay." Jennifer Murray Jewell, No. M2015-02141-CCA-R3-CD, 2017 WL 65242, at *5. The trial court found the victim's pecuniary loss to be $52,000, which the Appellant does not challenge on appeal. The trial court noted that the Appellant could work multiple jobs, such as in cosmetology and welding.

As we have noted, the Appellant contends that his felony conviction and his probationary sentence prevent him from obtaining employment in either coal mining or welding. In response, the State notes that although the Appellant's testimony reflects that he would have to wait seven years to pass a background check in order to return to coal mining, the Appellant presented no proof that welding had such a restriction. Further, the State notes that although the Appellant contends that he was not able to accept a welding job because the terms of his probation prohibited him from traveling out of state, the Appellant presented no proof that all welding jobs required out of state travel. Moreover, the Appellant testified that he had previously earned as much as $3,500 to $4,000 every two weeks as a welder. The trial court took this information into consideration when determining the total amount of restitution and the monthly payments. This court has previously stated that "[i]f the monthly payment amount appears to be excessive based upon the anticipated income of the defendant, the trial court is in a better position to determine whether relief is warranted at some future date." State v. Jerry Lee Truette, No. M2005-00927-CCA-R3-CD, 2006 WL 2000540, at *4 (Tenn. Crim. App. at Nashville, July 19, 2006), see Tenn. Code Ann. § 40-35-304(f). Moreover, the Appellant "has the ability to petition for adjustment of the restitution, as does the State." Jennifer Murray Jewell, No. M2015-02141-CCA-R3-CD, 2017 WL 65242, at *7 (citing Tenn. Code Ann. § 40-35-304(f)). Given the Appellant's earning potential, the trial court did not abuse its discretion in imposing the amount of restitution.

## III. Conclusion

The judgment of the trial court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE